UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| NETGEAR INC.<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | Court No. 22-00129 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56 MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted,

George R. Tuttle, III
Law Offices of George R. Tuttle, A.P.C.
3950 Civic Center Drive, Suite 102
San Rafael, CA 94903
Tel. (415) 986-8780
Email: geo@tuttlelaw.com

Attorney for Plaintiff Netgear Inc.

Dated: October 26, 2026

TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................1

HISTORY OF THE ACTION ....................................................................................3

II. QUESTIONS PRESENTED....................................................................................5

III. JURISDICATION AND STANDARD OF REVIEW ....................................................5

IV. STATUTORY PROVISIONS ....................................................................................7

V. SUMMARY OF ARGUMENT ....................................................................................8

VI. ARGUMENT ....................................................................................8

A. The Entry at Issue Satisfies All Requirements for Classification Under Subheading 9802.00.50....................................................................................8

1.The LTE Routers Were Completed Articles Before Exportation ................11

2.The Work Abroad Did Not Destroy the Essential Characteristics of the Routers or Create New Commercially Different Articles ..........................................12

3.The Foreign Rework Constituted an Acceptable Alteration Under Subheading 9802.00.50....................................................................................17

4.The Documentary Record Establishes Identity and Compliance With 19 C.F.R. § 10.8....................................................................................20

5.Netgear's Declarations are Timely ..........................................................24

B. Section 301 Duties Should Be Assessed on the Qualifying Foreign Repair or Alteration Value....................................................................................29

VII. CONCLUSION....................................................................................30

TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (S. Ct. 1986) ........................................................ 6

*Aviall of Texas, Inc. v. United States*, 18 CIT 727 (Ct. Int'l Trade 1994) .................................... 25

*Bausch & Lomb v. United States*, 148 F.3d 1363 (Fed. Cir. 1998) ................................................ 6

*BenQ America Corp. v. United States*, 646 F.3d 1371 (Fed. Cir. 2011) ....................................... 6

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999) ............................................. 6, 9

*Chevron Chemical Co. v. United States*, 23 C.I.T. 500 (Ct. Int'l Trade 1999) ...... 9, 11, 12, 17, 18

*Cummins Inc. v. United States*, 454 F.3d 1361 (Fed. Cir. 2006) .................................................. 7

*Data General Corp. v. United States*, 4 CIT 182 (Ct. Int'l Trade 1982) ..................................... 17

*Dolliff & Co. v. United States*, 66 C.C.P.A. 77 (C.C.P.A. 1979) .............................. 11, 12, 13, 18

*Fauss Group, Inc. v. United States*, 581 F.3d 1369 (Fed. Cir. 2009) ............................................ 6

*Guardian Industries Corp. v. United States*, 3 CIT 9 (Ct. Int'l Trade 1982) .............. 9, 11, 12, 13

*Gulfstream Aerospace Corp. v. United States*, 21 CIT 1083 (Ct. Int'l Trade 1997)... 25, 26, 27, 28

*IKO Indus. Ltd v. United States*, 105 F.3d 624 (Fed. Cir. 1997) .................................................... 7

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984) ................................................. 7

*Leather's Best, Inc. v. United States*, 10 CIT 321 (Ct. Int'l Trade 1986) ..................................... 26

*Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304 (Fed. Cir. 2003) ............................................ 9

*Link Snacks, Inc. v. United States*, 742 F.3d 962 (Fed Cir. 2014) ................................................. 7

*Mattel, Inc. v. United States*, 624 F.2d 1076 (C.C.P.A. 1980) ............................................. 25, 28

*May Food Mfg. v. United States*, 33 C.I.T. 430 (Ct. Int'l Trade 2009) ......................................... 2

*North Am. Processing Co. v. United States*, 236 F.3d 695 (Fed. Cir. 2001) .................................. 9

*Pleasure-Way Industries, Inc. v. United States*, 878 F.3d 1348 (Fed. Cir. 2018)............ 10, 14, 18

*Plexus Corp. v. United States*, 489 F. Supp. 3d 1379 (Ct. Int'l Trade 2020) ............................ 6, 9

*Press Wireless v. United States*, 6 Cust. Ct. 102 (Cust. Ct. 1941)................................................ 9

*Rollerblade, Inc. v. United States*, 112 F.3d 481 (Fed. Cir. 1997) ........................................... 6, 7

*Royal Bead Novelty Co. v. United States*, 68 Cust. Ct. 154 (Cust. Ct. 1972).............................. 20

*Sports Graphics, Inc. v. United States*, 24 F.3d 1390 (Fed. Cir. 1994) ........................................ 6

*Tikal Distrib. Corp. v. United States*, 24 C.I.T. 149 (Ct. Int'l Trade 2000) .................................. 6

*United States v. Mead Corp*., 533 U.S. 218 (S. Ct. 2001) ........................................................... 7

*Universal Elecs. Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997).......................................... 7

*Warner-Lambert Co. v. United States*, 407 F.3d 1207 (Fed. Cir. 2005)....................................... 7

**Statutes**

19 U.S.C. § 1514(a) ............................................................................................................. 6, 27

28 U.S.C. § 1581(a) .................................................................................................................... 5

28 U.S.C. § 2639(a)(1)................................................................................................................ 7

28 U.S.C. § 2640(a)(1)................................................................................................................ 6

**Other Authorities**

19 C.F.R. § 10.112 ............................................................................................ 24, 25, 26, 27, 28

19 C.F.R. § 10.8 ............................................................................ 1, 2, 5, 7, 10, 11, 20, 23, 24, 27

19 C.F.R. § 181.64(a)................................................................................................................ 10

9802.00.50, HTSUS ................................................................................................................... 15

**Treatises**

8517.62.0020, HTSUS ........ 3, 4, 5

9802.00.50, HTSUS ........ 1, 2, 3, 5, 7, 8, 9, 10, 15, 16, 17, 20, 24, 27, 28, 29, 30

9903.88.04, HTSUS ........ 3, 4, 5, 8, 29

Chapter 98, Subchapter II U.S. Note 3(a) ........ 18

Chapter 98, U.S. Note 1 ........ 7, 9

**Regulations**

CIT Rule 56 ........ 1, 6

**Constitutional Provisions**

Flinders, Mesh, and Ian Smalley. "Firmware vs. Software: What's the Difference and Why Does It Matter?" *IBM*, September 23, 2024. https://www.ibm.com/think/insights/firmware-vs-software (Pl. Exhibit 20) ........ 2

Hardesty, George. "LTE / 4G Router Guide." *Data Alliance*, January 23, 2026. https://www.data-alliance.net/blog/lte-4g-routers-guide (Pl. Exhibit 19) ........ 2, 3

HQ 221603 (April 30, 1991) ........ 27

HQ 544455 (Mar. 14, 1995) ........ 27

HQ 555269 (Dec. 20, 1990) ........ 27

HQ 557707 (May 4, 1994) ........ 28

HQ 562513 (Jan. 14, 2003) ........ 15

HQ 562514 (Jan. 14, 2003) ........ 15

HQ 562515 (Jan. 14, 2003) ........ 15, 16

HQ 562516 (Jan. 14, 2003) ........ 15

NY N026499 (April 29, 2008) ........ 17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| NETGEAR INC.<br>Plaintiff,<br>v.<br><br>UNITED STATES,<br>Defendant. | Court No. 22-00129 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56 MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Netgear Inc. (hereinafter "Netgear"), by and through undersigned counsel, pursuant to Rule 56 of the U.S. Court of International Trade (CIT), hereby submits this memorandum in support of Plaintiff's CIT Rule 56 Motion for Summary Judgment. For the reasons set forth herein, the Court should grant Plaintiff's Motion.

## I. INTRODUCTION

Goods exported from the United States for repairs or alterations abroad may, upon their return to the United States, qualify for preferential duty treatment under subheading 9802.00.50 of the Harmonized Tariff Schedule of the United States (HTSUS), provided certain conditions are met.[1] Specifically, heading 9802 covers "[a]rticles returned to the United States after having been exported to be advanced in value or improved in condition by any process of manufacture

[1] 19 C.F.R. § 10.8

or other means," and subheading 9802.00.50 provides for "other" "[a]rticles exported for repairs or alterations." Articles qualifying under that provision are subject to duty on the value of the foreign repairs or alterations, rather than on the articles' full value. *May Food Mfg. v. United States*, 33 C.I.T. 430, 431 (Ct. Int'l Trade 2009).

The documentary requirements for claiming this treatment are set forth in 19 C.F.R. § 10.8 and require declarations by the person performing the work and by the owner, importer, consignee, or authorized agent, declaring amongst other things, that "the articles entered in their repaired or altered condition are the same articles that were exported and are identified in the declaration prepared by the foreign person who performed such repairs or alterations.

The issue in this case is whether certain Netgear LTE mobile routers,[2] originally configured for enterprise applications and subsequently exported to China for firmware / software[3] changes and associated rework, qualify for subheading 9802.00.50 when returned to the United States. Before exportation, the merchandise already functioned as LTE routers; the

---

[2] LTE mobile router is a compact network device that uses a cellular SIM card to connect to a 4G LTE wireless network and shares that internet connection with nearby devices via Wi-Fi, Ethernet, or USB. See Hardesty, George. "LTE / 4G Router Guide." *Data Alliance*, January 23, 2026. https://www.data-alliance.net/blog/lte-4g-routers-guide (Pl. Exhibit 19).

[3] For purposes of this memorandum, the terms "firmware" and "software" are used interchangeably to describe the programming and configuration changes performed on the LTE routers. Firmware is low-level code embedded in a hardware device to control its basic functions, while software generally refers to higher-level programs that perform tasks for the user. Both consist of instructions that enable hardware devices to function. Although there are technical differences between firmware and software, the terms are often used interchangeably. See Flinders, Mesh, and Ian Smalley. "Firmware vs. Software: What's the Difference and Why Does It Matter?" *IBM*, September 23, 2024. https://www.ibm.com/think/insights/firmware-vs-software (Pl. Exhibit 20).

foreign work principally removed software restrictions and updated firmware. The work performed entailed limited disassembly, reassembly, testing, and incidental replacement of parts. Netgear contends these operations minimally altered the completed articles without destroying their essential character or function as an LTE router or producing new and commercially different goods. See Pl.'s Rule 56.3 Plaintiff's Statement of Uncontested Material Facts ("PSUMF") ¶¶ 24, 29, 40-52.

This action challenges the denial of Netgear's protest no. 2720-21-104183 concerning Entry No. 113-8841055-4 by U.S. Customs and Border Protection ("Customs" or "CBP"). Customs liquidated the returned merchandise under subheading 8517.62.0020, HTSUS, and assessed Section 301 duties under subheading 9903.88.04 at 25 percent ad valorem. PSUMF ¶¶ 2–4, 9–11. Following liquidation, Netgear protested the duty assessment on the ground that subheading 9802.00.50 applies to the returned routers, and that the 9802.00.50 value is excluded from Section 301 duties. Pl. Exhibit No. 16. Customs denied the protest and this action was timely commenced. PSUMF ¶¶ 5–8.

**HISTORY OF THE ACTION**

Netgear imports LTE (Long-Term Evolution)[4] mobile routers, which are portable telecommunications devices that provide internet connectivity to computers, smartphones, and other electronic devices through a cellular wireless network. The routers receive data over an LTE cellular connection and provide internet access to connected devices through Wi-Fi,

---

[4] LTE is a wireless broadband communication standard.

Ethernet, or other supported connections.[5] The routers consist principally of a printed circuit board assembly containing the main electronic components, a power supply, an LCD display, and a plastic housing. PSUMF ¶ 24.

The LTE routers at issue are Netgear's MR1100 Nighthawk M1 Mobile Routers, which were manufactured by Wistron NeWeb Corporation in Enterprise and Retail configurations. PSUMF ¶¶ 24, 41-46, Plaintiff's Exhibits 8.1 and 7.1.

The LTE routers at issue were originally imported into the United States from China on November 23, 2018, under Consumption Entry No. 113-8465077-3, and classified under subheading 8517.62.0020[6], HTSUS, with additional Section 301 duties assessed under subheading 9903.88.04, HTSUS. PSUMF ¶¶ 20-22.

On January 21, 2020, Netgear exported 4,370 of the LTE routers to Wistron NeWeb involved software and firmware modifications to convert the routers from an "Enterprise configuration" to a "Retail configuration,"[7] together with limited disassembly, reassembly, component replacements, and testing. PSUMF ¶¶ 25, 29-30, 40-52; Pl. Exhibit No. 9.1.

Following the rework, the routers were returned to the United States on May 6, 2020,

---

[5] See Hardesty, George. "LTE / 4G Router Guide." *Data Alliance*, January 23, 2026.

https://www.data-alliance.net/blog/lte-4g-routers-guide (Pl. Exhibit 19).

[6] Subheading 8517.62.0020, HTSUS, provides for: Other apparatus for transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network): … including switching and routing apparatus; Switching and routing apparatus.

[7] The "Enterprise configuration" refers to Netgear's M1 LTE Mobile Router intended for [[redacted]] business customers and had certain functions restricted or disabled for business and security purposes. The "Retail configuration" refers to the same M1 LTE Mobile Router intended for [[redacted]] broader customer market and allowed users to enable additional functions, including USB tethering and Wi-Fi Protected Setup (WPS). See PSUMF ¶¶ 41-55.

under Consumption Entry No. 113-8841055-4. Upon liquidation, Customs classified the merchandise under subheading 8517.62.0020, HTSUS, and assessed Section 301 duties under subheading 9903.88.04 at 25 percent ad valorem on the full entered value of [[redacted]], resulting in additional duties of [[redacted]]. PSUMF ¶¶ 2-4, 9-11, 38; Plaintiff Exhibit No. 11.2 and Exhibit No. 11.2.

Netgear timely protested the assessment, asserting that the returned routers qualified for treatment under subheading 9802.00.50, HTSUS, as articles exported for repairs or alterations. Customs denied the protest on October 25, 2021. Netgear thereafter timely commenced this action, having paid all liquidated duties, taxes, and fees. PSUMF ¶¶ 5-8.

Following the pleadings, the parties engaged in discovery, including interrogatories, requests for production, and requests for admission. The parties' responses and documentary productions support Netgear's accompanying Rule 56.3 Statement of Material Facts.

## II. QUESTIONS PRESENTED

A. Whether the foreign processing of already completed LTE routers, which principally consisted of changes to software and firmware, with associated disassembly, minor parts replacement, testing, reassembly and repackaging, constitutes “repairs or alterations” within the meaning of subheading 9802.00.50, HTSUS, rather than manufacture of new or commercially different articles.

B. Whether Netgear has sufficiently established the identity of the exported and returned routers in compliance with 19 C.F.R. § 10.8, so that Section 301 duties are assessed only on the applicable foreign repair or alteration value rather than on the entered value.

## III. JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a), as plaintiff is contesting the

denial of its 19 U.SC. §1514(a) protest by CBP against the tariff classification, value, rate of duty, and liquidation of its returning repaired merchandise in question.

Pursuant to 28 U.S.C. § 2640(a)(1) and as determined by the Court in *Fauss Group, Inc. v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009); *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1378 (Fed. Cir. 1999); and *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483 (Fed. Cir. 1997), this Court determines the proper tariff classification of goods, *de novo*. Similarly, issues concerning valuation of imported merchandise is subject to *de novo* review by the court. *Tikal Distrib. Corp. v. United States*, 24 C.I.T. 149, 149, (Ct. Int'l Trade 2000).

"The ultimate question in a classification case is whether the merchandise is properly classified under one or another classification heading," which is "a question of law." *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1389 (Ct. Int'l Trade 2020), citing *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).

Tariff classification is a two-step process that guides the court in determining the proper classification of merchandise. *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994). First, the court must "ascertain[] the proper meaning of specific terms within the tariff provision." *BenQ America Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011). This is a question of law. Second, the court must determine "whether the merchandise at issue comes within the description of such terms as properly construed." *Id*. This is a question of fact.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact…." USCIT R. 56. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (S. Ct. 1986). Where there is no material factual dispute, as here, the two-step classification test "collapses entirely into a question of law," *Link Snacks, Inc. v. United States*,

742 F.3d 962, 965-966 (Fed Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)), and CBP's entitlement to the statutory presumption of correctness set out in 28 U.S.C. § 2639(a)(1) does not apply. See e.g., *United States v. Mead Corp*., 533 U.S. 218, 233 n. 16 (S. Ct. 2001); *Universal Elecs. Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997). Since there are no disputed material issues of fact to be resolved by trial, disposition by summary judgment is appropriate. The only task for the court is to construe the legal provisions at issue. See, e.g., *IKO Indus. Ltd v. United States*, 105 F.3d 624, 626-27 (Fed. Cir. 1997); *Rollerblade, Inc. v. United States*, 112 F.3d 481,483 (Fed. Cir. 1997).

The court has an independent legal responsibility to decide the proper scope and meaning of HTSUS terms. *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005). The Court is not limited to considering the classifications advanced by the parties but has an obligation to determine "whether the government's classification is correct, both independently and in comparison, with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

## IV. STATUTORY PROVISIONS

Chapter 98, HTSUS, contains special classification provisions. U.S. Note 1 to Chapter 98 provides that the chapter's provisions are not subject to the rule of relative specificity in GRI 3(a) and that an article described in the chapter is classifiable in that provision if the conditions and requirements of the provision and applicable regulations are met.

Subheading 9802.00.50, HTSUS, encompasses articles returned to the United States after exportation for repairs or alterations other than warranty repairs or alterations. The applicable regulations are set forth in 19 C.F.R. § 10.8. They prescribe declarations from the person who performed the repairs or alterations and from the owner, importer, consignee, or agent, and

address documentary substantiation of the claim. The treatment does not eliminate duties attributable to qualifying foreign work; it limits the dutiable basis as provided by the tariff provision.

The Government admits [see ECF 10, Answer ¶ 32] that articles eligible for subheading 9802.00.50 treatment are assessed Section 301 duties under subheading 9903.88.04 based on the value of repairs or alterations performed outside the United States, subject to the tariff provision and applicable regulations. The remaining issue is Netgear's eligibility for the preferential treatment.

## V. SUMMARY OF ARGUMENT

It is Netgear's assertion that the returned LTE routers (now identified as PN# 107-11387-01) imported under Entry No. 113-8841055-4 qualify under subheading 9802.00.50 because (1) they were completed and functioning LTE routers before exportation, (2) the foreign operations changed their firmware and software configuration without destroying their essential characteristics or producing a new, commercially different article, and (3) the declarations and contemporaneous shipment, serial-number and processing records establish the required export, return, and work performed. If those predicates are established, Section 301 duties apply to the qualifying foreign alteration value, not the preexisting value of the returned routers.

## VI. ARGUMENT

### A. The Entry at Issue Satisfies All Requirements for Classification Under Subheading 9802.00.50

It is well settled in Customs law that, absent contrary legislative intent, HTSUS terms are construed according to their common and commercial meanings. When interpreting a tariff term, the court may rely on its <u>own understanding of the terms</u> and on secondary sources such as

scientific authorities and dictionaries. *Plexus Corp. v. United States*, 489 F.Supp. 3d. 1379, 1390 (Ct. Int'l Trade, 2020 ) (citing *Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003)); *North Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001) (citing *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).

Chapter 98, HTSUS, covers "special classification provisions." U.S. Note 1 to HTSUS Chapter 98 provides that:

> [t]he provisions of this chapter are not subject to the rule of relative specificity in general rule of interpretation 3(a). Any article described in any provision in this chapter is classifiable in said provision if the conditions and requirements thereof and any regulations are met."

The Court need not resort to any GRIs beyond GRI 1 in this matter. If the imported articles meet the requirements articulated in subheading 9802.00.50, HTSUS, they are classifiable under that provision regardless of whether the articles are also prima facie classifiable under other provisions. U.S. Note 1 of HTSUS Chapter 98.

Subheading 9802.00.50, HTSUS, provides for articles returned to the United States after having been exported for repairs or alterations. Changes or additions to an existing article may constitute alterations under subheading 9802.00.50, HTSUS, provided the article retains its identity and is not converted into something else. See *Chevron Chemical Co. v. United States*, 23 C.I.T. 500, 507 (Ct. Int'l Trade 1999). In determining whether foreign processing creates a new or commercially different article, the Court considers changes in the article's name, use, performance characteristics, and tariff classification. See *Guardian Industries Corp. v. United States*, 3 CIT 9, 16 (Ct. Int'l Trade 1982).

In *Press Wireless v. United States*, 6 Cust. Ct. 102 (Cust. Ct. 1941), the Customs Court held that repairs are operations necessary to restore articles to their original condition but cannot be so extensive as to destroy the identity of the exported article or create a new or different

article. See also 19 C.F.R. § 181.64(a) (defining "repairs or alterations" as the restoration, addition, renovation, redyeing, cleaning, resterilizing, or other treatment which does not destroy the essential characteristics of, or create a new or commercially different good from, the good exported from the United States.); *Pleasure-Way Industries, Inc. v. United States*, 878 F.3d 1348, 1350-1355 (Fed. Cir. 2018) (applying § 181.64 to determine whether foreign processing constituted qualifying alterations under subheading 9802.00.50, HTSUS).

For items to be classifiable under subheading 9802.00.50, HTSUS must meet the following criteria:

(1) The articles must have been exported from the United States for repairs or alterations;

(2) The articles must have been complete and suitable for their intended use prior to exportation;

(3) The operations performed abroad must constitute repairs or alterations that do not destroy the essential characteristics or identity of the exported articles or create new or commercially different articles;

(4) The articles returned to the United States must be the same articles that were exported, subject to the qualifying repairs or alterations; and

(5) The importer must comply with the documentary requirements of 19 C.F.R. § 10.8, including the required declarations from the person who performed the repairs or alterations and the owner, importer, or consignee.

The primary questions before the Court are whether the operations performed on the LTE routers in China constituted repairs or alterations within the meaning of subheading 9802.00.50, HTSUS, and whether those operations preserved the essential characteristics and identity of the exported articles without creating new or commercially different merchandise. In addition, the

Court must determine whether the returned LTE routers were the same articles previously exported from the United States and whether Netgear satisfied the documentary requirements of 19 C.F.R. § 10.8.

### 1. The LTE Routers Were Completed Articles Before Exportation

Repairs and alterations generally involve completed articles, not operations carried out as ordinary intermediate steps in making an unfinished article fit for its intended use. *Dolliff & Co. v. United States*, 66 C.C.P.A. 77, 82 (C.C.P.A. 1979); *Guardian Indus. Corp. v. United States*, 3 CIT 9, 12 (Ct. Int'l Trade 1982). In *Chevron Chemical Co. v. United States*, 23 CIT 500, 507 (Ct. Int'l Trade 1999), the Court recognized that changes or additions may constitute alterations where the existing article retains its identity and is not converted into something else.

The LTE routers at issue were originally imported into the United States from China on November 23, 2018, under Consumption Entry No. 113-8465077-3. The merchandise was identified as LTE ROUTER, D69N3, Model MR1100ABS-2A1NAS, **Part No. 107-11388-01**, and was purchased by Netgear from its contract manufacturer, Wistron NeWeb Corporation, at a price of [[redacted]] per unit. PSUMF ¶¶ 20, 22-23.

At the time of their original importation, the routers were fully assembled telecommunications devices consisting principally of a printed circuit board assembly for the main board and power supply, a display connected to the main board, and a plastic housing. PSUMF ¶ 25. These routers were the Enterprise (business) version of Netgear's M1 LTE Mobile Router, with the PN# 107-113889-0, intended to be offered by [[redacted]] for its enterprise wireless customers. PSUMF ¶¶ 41, 53.

The Enterprise configuration was not an incomplete or unfinished version of the Retail router. Rather, it was a completed LTE router configured for commercial business use. In the

Enterprise configuration functions such as USB tethering and Wi-Fi Protected Setup (WPS), are disabled or restricted for security reasons. These restrictions did not render the Enterprise router incomplete or unsuitable for its intended use. Both the Enterprise and Retail versions[8] were manufactured by Wistron and shared the same assembly and disassembly processes. PSUMF ¶¶ 42-46, 51-54.

Accordingly, the routers exported by Netgear were completed articles suitable for their intended use before exportation. The subsequent foreign operations were not necessary steps in the original manufacture of the routers, but rather modifications to existing, fully manufactured telecommunications devices to enable additional functions for retail customers. PSUMF ¶¶ 44-52, 55.

### 2. The Work Abroad Did Not Destroy the Essential Characteristics of the Routers or Create New Commercially Different Articles

In determining whether foreign processing constitutes a qualifying alteration, the relevant inquiry is whether the processing preserves the identity of the completed article or creates new or commercially different merchandise. See *Chevron Chemical Co. v. United States*, 23 CIT 500, 507 (Ct. Int'l Trade 1999); *Guardian Industries Corp. v. United States*, 3 CIT 9, 12–14 (Ct. Int'l Trade 1982). As the court explained in *Dolliff & Co. v. United States*, 66 C.C.P.A 77, 82 (C.C.P.A. 1979):

> [R]epairs and alterations are made to completed articles and do not include intermediate processing operations which are performed as a matter of course in the

[8] The Enterprise and Retail versions are the same M1 LTE Mobile Routers, but the Enterprise version is intended for business customers, with certain functions disabled for business and security purposes, and the Retail version is intended for a broader customer market with certain functions enabled, including USB tethering and Wi-Fi Protected Setup (WPS). See PSUMF ¶¶ 41-54.

preparation or manufacture of finished articles.

The Enterprise and Retail versions of Netgear's M1 LTE Mobile Router differed principally in their hardware/ software configurations and intended customer markets. Certain functions, such as USB tethering, Ethernet tethering, Wi-Fi Protected Setup (WPS), and media server functionality, were restricted in the Enterprise version for business and security purposes. The Retail version permitted these additional functions. PSUMF ¶¶ 41, 45-46, 52-54.

Netgear subsequently sought to modify the Enterprise version so that they could be sold and used as the Retail version. PSUMF ¶ 55, 58. Because Netgear did not have facilities in the United States to perform the necessary repairs or modifications, the routers were sent back to Wistron, Netgear's contract manufacturer, which was expected to perform the work necessary to enable the Enterprise configuration to operate as the Retail configuration. Sending routers back to Wistron for repairs was consistent with Netgear's usual practice. PSUMF ¶¶ 56-59.

Accordingly, on or about January 21, 2020, Netgear exported 4,370 LTE routers from the Port of Los Angeles to Wistron NeWeb Service (Kunshan) Corp. in China for the purpose of performing the requested work. The routers were identified in the export documentation as Model MR1100-2A1NAS, with a declared export value of [redacted] per unit, or [[redacted]] in total. This amount reflected the consigned inventory value of the units, which Netgear had classified as obsolete inventory in its accounting system. PSUMF ¶¶ 25-27; Pl. Exhibit No. 9.1. The same product/model designation is on the re-import entry 113-8841055-4 and accompanying commercial invoice. Pl. Exhibit 3.1 and 3.2.

Unlike the unfinished fabric in *Dolliff*, Netgear's LTE routers were completed articles suitable for their intended use before exportation. Moreover, unlike the glass in *Guardian Industries*, which acquired materially different characteristics and commercial uses through foreign processing, Netgear's routers retained their fundamental characteristics and function as

LTE routers, including their circuit board assemblies, displays, and housings, and continued to perform the same essential function of providing wireless internet connectivity to connected devices. PSUMF ¶¶ 24, 40-52.[9]

The Federal Circuit's decision in *Pleasure-Way Industries, Inc. v. United States*, 878 F.3d 1348 (Fed. Cir. 2018), further illustrates the distinction between qualifying alterations and processing that creates commercially different merchandise. In *Pleasure-Way*, the court determined that converting cargo vans into motorhomes created commercially different articles, relying on substantial changes in the vehicles' use, customer market, pricing, name, and tariff classification. *Id.* at 1353-55. The converted motorhomes served a fundamentally different commercial purpose from the cargo vans originally exported.

The circumstances here are materially different. Both the Enterprise and Retail versions belonged to Netgear's MR1100 LTE Mobile Router product family, shared the same basic hardware construction and assembly processes, and performed the same fundamental function of providing wireless internet connectivity. PSUMF ¶¶ 41-46, 51-54, 61. Although the versions had different model and part numbers and were intended for somewhat different customer markets, both remained LTE mobile routers intended for use by [[redacted]] customers, with the same use and tariff classification. Moreover, Netgear's amended purchase agreement with [[redacted]] identifies both configurations within the same product family and lists the same contractual unit price for each. PSUMF ¶ 61; Pl. Exhibit No. 10.1. Unlike the cargo vans and motorhomes in *Pleasure-Way*, the exported and returned routers retained substantially the same commercial function, physical construction, and product identity.

---

[9] With the exception of 2 units which had their LCDs replaced because they cracked.

Accordingly, the changes in hardware/ software configuration, model designation, and intended customer market do not establish that the foreign operations created new or commercially different merchandise. Considered together, the nature of the articles before and after rework supports the conclusion that Wistron altered completed LTE routers rather than manufactured different goods.

Customs has recognized that repairs or alterations may include disassembly, replacement of parts, reprogramming of electronic components, and functional upgrades, provided the exported article retains its essential identity. See rulings CBP HQ 562513, HQ 562514, HQ 562515 and HQ 562516 (Jan. 14, 2003). Thus, the fact that foreign processing improves an article's performance, accessibility, or enables additional functions does not, by itself, preclude treatment under subheading 9802.00.50, HTSUS.

In ruling HQ 562515, dated January 14, 2003, (Pl. Exhibit No. 17) and the corresponding rulings HQ 562513, HQ 562514 and HQ 562516, Customs considered whether photocopiers exported from the United States to Mexico for extensive reconditioning and conversion from one model to another qualified for treatment under subheading 9802.00.50, HTSUS. The operations included partial disassembly, replacement and repair of parts and subassemblies, reprogramming of electronic components, reassembly, and testing. Customs determined that the operations constituted qualifying repairs or alterations because they did not destroy the essential identity of the photocopiers or create new or commercially different articles. Customs further recognized that reprogramming electronic components to provide upgraded functionality did not change the identity of the exported merchandise but rather improved the product and advanced its value. Accordingly, Customs concluded that the photocopiers qualified for treatment under subheading 9802.00.50, HTSUS, and revoked its earlier contrary ruling.

The reasoning in HQ 562515 applies here. Like the photocopiers considered in that ruling, Netgear's routers underwent software modifications, limited component replacements, reassembly, and testing while retaining their essential identity and function. Specifically, Wistron uploaded a new PRI (Product Release Instructions) configuration package and updated the routers' firmware to remove software restrictions imposed on the Enterprise configuration (Part No. 107-11388-01). These modifications enabled USB tethering, which allows devices to establish a data connection to the LTE router through a USB cable rather than Wi-Fi, and Wi-Fi Protected Setup (WPS), which allows compatible devices to connect to the router's wireless network through a simplified authentication process, such as push-button pairing, without manually entering the network password. These features were previously disabled in the Enterprise configuration (Part No. 107-11388-01) but were enabled in the Retail configuration (Part No. 107-11387-01) following rework. Thus, the software modifications expanded the available connectivity options and simplified wireless network access without altering the routers' underlying hardware architecture or fundamental function of providing LTE wireless internet connectivity. Accordingly, the conversion from the Enterprise configuration (Part No. 107-11388-01) to the Retail configuration (Part No. 107-11387-01) constituted an alteration of existing merchandise rather than the manufacture of new or commercially different articles. PSUMF ¶¶ 40, 44-45, 47-52.

Similarly, in ruling NY N026499, dated April 29, 2008, (Pl. Exhibit No. 18) Customs considered whether motor vehicle audio amplifiers exported from the United States to Mexico for software upgrades and associated modifications qualified under subheading 9802.00.50, HTSUS. The operations included inspection, software review and installation of updated software, system resets, attachment of mounting brackets using screws, and functional and

quality-control testing. Customs determined that these operations constituted qualifying alterations under subheading 9802.00.50, HTSUS. Like the amplifiers in NY N026499, Netgear's LTE routers were completed electronic devices before exportation and underwent software modifications, testing, and limited physical alterations without losing their fundamental identity or function. PSUMF ¶¶ 24, 39-40, 44, 47-51.

The distinction between programming an electronic device to establish its essential functionality and modifying the software of an already functioning device is illustrated by *Data General Corp. v. United States*, 4 CIT 182 (Ct. Int'l Trade 1982). In that case, the Court determined that programming previously unprogrammed PROMs (programmable read only memories) constituted a substantial transformation because the programming established the electronic circuitry's defining function as a read-only memory device. *Id*. at 186–87. Unlike the unprogrammed PROMs in *Data General*, Netgear's Enterprise routers were already completed, functioning LTE routers before exportation. The software and firmware modifications did not establish their fundamental functionality as telecommunications devices but instead removed restrictions on certain existing features to permit their use in the Retail configuration. PSUMF ¶¶ 24, 41-52.

### 3. The Foreign Rework Constituted an Acceptable Alteration Under Subheading 9802.00.50

Subheading 9802.00.50 provides favorable duty treatment for articles exported for non-warranty repairs or alterations and returned to the United States. Under that provision, duty is assessed on the value of the foreign repairs or alterations rather than on the article’s full value. *Chevron Chem. Co. v. United States*, 23 C.I.T. 500, 507 (Ct. Int'l Trade 1999). See also Chapter

98, Subchapter II U.S. Note 3(a)[10].

The controlling distinction is between an alteration of a completed article and foreign processing that completes an unfinished good. Changes or additions qualify as alterations when the original article retains its identity and is not converted into something else. *Chevron Chem. Co. v. United States*, 23 C.I.T. 500, 508 (Ct. Int'l Trade 1999). Processing does not qualify when it is performed on unfinished goods as an ordinary step in producing completed articles. *Dolliff & Co. v. United States*, 66 C.C.P.A. 77, 82 (C.C.P.A. 1979). The Federal Circuit has reaffirmed that processing unfinished goods into completed articles cannot be treated as an alteration. *Pleasure-Way Indus. v. United States*, 878 F.3d 1348, 1355 (Fed. Cir. 2018).

The routers in question satisfy this standard because the foreign processing was performed on <u>completed</u> LTE wireless routers rather than unfinished assemblies requiring further manufacturing. Before exportation, both the Enterprise version (Part No. 107-11388-01) and the Retail version (Part No. 107-11387-01) were produced by Wistron for Netgear and shared the same construction and assembly processes. PSUMF ¶¶ 24, 41-44. The principal differences between them involved software restrictions that disabled certain functions in the Enterprise version for business and security purposes. PSUMF ¶¶ 45-46.

---

[10] Chapter 98, Subchapter II U.S. Note 3(a) states:

(a) The value of repairs, alterations, processing or other change in condition outside the United States shall be:

> (i) The cost to the importer of such change; or
>
> (ii) If no charge is made, the value of such change,
>
> as set out in the invoice and entry papers; except that, if the appraiser concludes that the amount so set out does not represent a reasonable cost or value, then the value of the change shall be determined in accordance with section 402 of the Tariff Act of 1930, as amended.

Wistron's rework consisted of modifying the software configuration and reassembling and testing the existing routers. The process began with unpacking and sorting the units, followed by partial disassembly to access the circuit board. Wistron then uploaded the Retail firmware, performed board-level testing, reassembled the routers, conducted additional functional testing, applied updated labels, and completed a final power-on check and cosmetic inspection. PSUMF ¶ 40.

The principal software modification involved uploading a new PRI (Product Release Instructions) configuration package that removed restrictions on functions previously disabled in the Enterprise version, including USB tethering and Wi-Fi Protected Setup (WPS). Wistron also uploaded updated firmware and restored the applicable default settings, allowing those functions to be enabled in the Retail version. PSUMF ¶¶ 47-52. These operations modified the hardware/ software configuration of functioning LTE routers; they did not establish the devices' original telecommunications functionality or create new routers from unfinished components.

The physical operations performed during the rework were associated with the disassembly and reassembly necessary to perform the hardware /software modifications. Wistron used replacement covers, light pipes, screws, tape, and foam when reassembling the units. During the rework, two LCD modules were damaged and replaced, at a combined cost of [[redacted]]. PSUMF ¶¶ 30, 40. The repair/alteration work therefore involved modifying and reassembling existing devices, with limited component replacements, rather than producing new telecommunications equipment.

Wistron also inspected the lithium-ion batteries packaged with the routers and identified oxidation or deterioration affecting certain battery packs. Ultimately, 656 replacement batteries were charged to Netgear at [[redacted]] each, totaling [[redacted]]. PSUMF ¶¶ 17–18, 33-34. The

battery packs were packaged separately from the routers and were not installed as part of the conversion process. Netgear does not include their replacement cost in its claim under subheading 9802.00.50. PSUMF ¶¶ 35-36.

Thus, the actual foreign operations consisted principally of software and firmware modifications, disassembly and reassembly, testing, relabeling, and limited replacement of components in already completed LTE routers. The processing did not create a new type of device or change the merchandise's fundamental function as an LTE mobile router. Rather, it altered existing routers to permit the use of additional features in the Retail configuration. PSUMF ¶¶ 39-40, 44, 47-52.

Comparable alteration analysis supports this conclusion. In *Royal Bead Novelty Co. v. United States*, 68 Cust. Ct. 154, 157-161 (Cust. Ct. 1972), the court recognized that foreign processing could constitute an alteration where the exported and returned articles retained their identity, size, shape, and manner of use, and the processing changed their finish without creating a different article. Similarly, Wistron's rework modified the software configuration and certain limited physical components of completed LTE routers without changing their fundamental nature or use as telecommunications devices. PSUMF ¶¶ 24, 40, 44, 47-51.

Accordingly, the foreign operations constituted alterations to completed articles within the meaning of subheading 9802.00.50, HTSUS, rather than manufacturing operations that created new or commercially different merchandise.

#### 4. The Documentary Record Establishes Identity and Compliance With 19 C.F.R. § 10.8.

For articles claimed under subheading 9802.00.50, HTSUS, 19 C.F.R. § 10.8 requires a declaration from the person performing the repairs or alterations identifying the articles, describing the operations performed, stating the full cost or value of those operations, and

confirming that no substitution was made. The regulation also requires a declaration from the owner, importer, consignee, or agent having knowledge of the pertinent facts confirming that the articles were exported from the United States for repairs or alterations without the benefit of drawback and that the returned articles are the same articles previously exported. 19 C.F.R. § 10.8(a)(1)–(2). PSUMF ¶¶ 13-15, 19.

The documentary record establishes the history of the LTE routers from their original importation into the United States through their exportation for rework and subsequent return. The routers were originally imported from China on November 23, 2018, under Consumption Entry No. 113-8465077-3. The original entry documentation and accompanying Wistron invoices (nos. 962221 and 962222) identify the merchandise as Item No. 81D69N31.G10, described as LTE ROUTER, D69N3, Part No. 107-11388-01, Model MR1100ABS-2A1NAS, the Enterprise version of Netgear's M1 LTE Mobile Router. PSUMF ¶¶ 20-23.

On or about January 21, 2020, Netgear exported 4,370 LTE routers from the Port of Los Angeles to Wistron NeWeb Service (Kunshan) Corp. in China for rework. The export documentation includes Automated Export System (AES)[11] Filing No. A2001830052, the commercial invoice and packing list associated with RMA No. SR79134, and the corresponding bill of lading. These documents identify the merchandise exported for rework and establish the shipment to Wistron, listing the 4,370 “Aircard Mobile Router,” Item Code MR1100-2A1NAS, MFG PN# 81D69N31.G10. PSUMF ¶ 25.

[11] The Automated Export System (AES) is the electronic system used by U.S. exporters and freight forwarders to report international export data—known as Electronic Export Information (EEI)—to the U.S. government. Managed jointly by U.S. Customs and Border Protection (CBP) and the U.S. Census Bureau. AES runs inside CBP's Automated Commercial Environment (ACE) portal. https://www.cbp.gov/trade/automated/how-to-use-ace/introduction. Last visited 10/23/2026.

Following completion of the rework, the routers were returned to the United States under Consumption Entry No. 113-8841055-4 on May 6, 2020. The reimport documentation includes Wistron Invoice No. 1128944, the accompanying packing list, and Bill of Lading No. HK2001089. The merchandise was identified upon reimportation as Item No. 81D69N31.GO9, LTE ROUTER, D69N3, Part No. 107-11387-01, Model MR1100-2A1NAS, reflecting the Retail configuration following the software and firmware modifications. PSUMF ¶¶ 2, 9, 38; Pl. Exhibit No. 11.1 and Exhibit No. 11.2.

Netgear produced an Excel workbook entitled “SR791344370 pcs SN,” containing the serial numbers of the 4,370 LTE routers reimported into the United States following rework. Netgear also produced an Excel workbook entitled “WNC Return Shipment SN SR79134 107-11388-01 4370 pcs,” identifying the 4,370 LTE routers originally exported to Wistron for rework, including their serial numbers, MAC addresses, and original model and part numbers. A comparison of the serial numbers in the two workbooks confirms that all 4,370 LTE routers exported to Wistron under RMA No. SR79134 were the same physical routers subsequently reimported into the United States following rework. PSUMF ¶ 25, 62; Pl. Exhibits No. 9.1 and 11.1; Declaration of Raymond A. Ernenwein, ¶¶ 2-5.

The contemporaneous correspondence between Netgear and Wistron further connects the exported routers to the rework and subsequent return shipment. Wistron's April 2020 correspondence identifies RMA No. SR79134 and the same quantity of 4,370 routers, discusses the work being performed on those units, and documents the costs associated with the rework. The return documentation subsequently identifies Wistron as the shipper and Netgear as the consignee of the reworked LTE routers under Entry No. 113-8841055-4. PSUMF ¶¶ 25, 29-31, 37-38, 62; Plaintiff's Exhibit No. 10.2.

Taken together, the export records, serial-number documentation, contemporaneous rework correspondence, Wistron's declaration, and reimportation records establish a consistent documentary chain identifying the routers exported to Wistron and returned following rework. The change in part number from 107-11387-01 to 107-11388-01 reflects the conversion from the Enterprise to the Retail configuration, rather than the substitution of different physical routers. PSUMF ¶¶ 15, 19, 25, 38, 41-52, 60, 62.

Netgear also provided the declarations prescribed by 19 C.F.R. § 10.8. On October 1, 2021, Wistron NeWeb Service (Kunshan) Corp. executed a shipper's repair/alteration declaration identifying the merchandise and certifying that the articles returned following rework were the same articles received for repairs or alterations. The declaration reported a total repair-or-alteration cost of [[redacted]] and a total value of the articles following rework of [[redacted]. PSUMF ¶¶ 15-16. The declaration further identified the replacement of 656 lithium-ion battery packs at a total cost of [[redacted]]. PSUMF ¶¶ 17-18.

On June 6, 2022, Kelly Nakamura, Netgear's then Vice President of Tax, executed the owner/importer/consignee declaration confirming that the articles were exported from the United States for repairs or alterations without the benefit of drawback and that the articles returned in their repaired or altered condition were the same articles previously exported. PSUMF ¶ 19.

The declarations are supported by the underlying commercial and shipping records, including the original entry documentation, export invoice and packing list, AES filing, bills of lading, RMA records, and reimport documentation. PSUMF ¶¶ 20-22, 25, 38. Together, these records document the movement of the merchandise from the United States to Wistron for rework and its subsequent return under the entry at issue.

The fact that the merchandise was identified under a different part number following

rework does not, by itself, establish that different physical articles were imported. As explained above, the change from Part No. 107-11388-01 to Part No. 107-11387-01 reflected the conversion from the Enterprise to the Retail configuration of the LTE Router. Both configurations were versions of the same MR1100 LTE Mobile Router, manufactured by Wistron, and shared the same assembly and disassembly processes. PSUMF ¶¶ 41-44. The software modifications enabled previously disabled functions without changing the fundamental identity of the merchandise as LTE routers. PSUMF ¶¶ 44, 47-52.

Although the declarations required under 19 C.F.R. § 10.8 were not submitted at the time of entry, their subsequent execution and production do not preclude Netgear from obtaining the benefits of subheading 9802.00.50, HTSUS. Customs regulations expressly permit the post importation filing of documents supporting claims for duty-free or reduced-duty treatment under certain circumstances.

**5. Netgear's Declarations are Timely**

19 C.F.R. § 10.112[12] provides that when a document, form, or statement required for free entry or reduced-duty treatment is not filed at the time of entry, it may be filed before liquidation

---

[12] 19 C.F.R. § 10.112 states:

**§ 10.112 Filing free entry documents or reduced duty documents after entry.**

> Whenever a free entry or a reduced duty document, form, or statement required to be filed in connection with the entry is not filed at the time of the entry or within the period for which a bond was filed for its production, but failure to file it was not due to willful negligence or fraudulent intent, such document, form, or statement may be filed at any time prior to liquidation of the entry or, if the entry was liquidated, before the liquidation becomes final.

becomes final, provided the post-entry filing was not due to willful negligence or fraudulent intent. The regulation is remedial in nature and was intended to relieve restrictions on the filing of documents supporting claims for favorable duty treatment. See *Aviall of Texas, Inc. v. United States*, 18 CIT 727, 732 (Ct. Int'l Trade 1994).

In *Mattel, Inc. v. United States*, 624 F.2d 1076 (C.C.P.A. 1980), the Court of Customs and Patent Appeals considered whether an importer could submit documents supporting duty-free treatment after entry under 19 C.F.R. § 10.112. The lower court had denied relief because the importer intentionally failed to submit the required documents when it believed Customs would reject its claim. The appellate court reversed, explaining that an intentional decision or action not to file does not necessarily constitute willful negligence. Rather, willful negligence involves both a deliberate omission and reckless disregard of the consequences. *Id*. at 1079–80. The court concluded that the importer's actions demonstrating an absence of willful negligence and permitted the late filing of its supporting documents with the Customs Court.

Similarly, in *Gulfstream Aerospace Corp. v. United States*, 21 CIT 1083, 1096–1101 (Ct. Int'l Trade 1997), the Court of International Trade recognized that § 10.112 permits the late filing of documentation supporting duty-free treatment notwithstanding other regulatory filing requirements. The court emphasized the remedial purpose of § 10.112 and determined that the importer was entitled to relief where the record demonstrated an absence of willful negligence or fraudulent intent. In that case, the court emphasized that:

> Customs has explicitly held that § 10.112 allows duty-free documentation to be submitted with a protest, even where the documentation was required at time of entry:
>
> Although the proper documentation . . . establishing protestant's GSP claim, was not filed *at the time of entry*, as long as failure to file it was not due to willful negligence or fraudulent intent, the documentation may be filed at any time before liquidation or . . . before liquidation became final . . . . If liquidation was timely

> protested, the protestant should be afforded an opportunity to submit documentation establishing free or reduced duty entry.
>
> HQ 544455 (Mar. 14, 1995) (citing HQ 555269 (Dec. 20, 1990)) (emphasis added).
>
> The protestant was required to file, *in connection with its entries*, documents that would have established the eligibility of its merchandise for a duty reduction . . . . The protestant did not file the necessary documents *at time of entry*, but submitted them [five months after liquidation] . . . . 19 CFR 10.112 [sic] [] provides that if the importer fails to file the documents [] *at the time of entry* . . . but failure to file was not due to willful negligence or fraudulent intent, then they may be filed at any time prior to [final] liquidation . . . .
>
> HQ 221603 (April 30, 1991) (emphasis added).
>
> 19 CFR 10.112 [sic] provides . . . that a free entry document required *in connection with entry* . . . may be filed before liquidation becomes final, if lack of presentation *at time of entry* was not willful or negligent. This section is applicable because [the regulation requiring reduced duty documentation] requires [the documentation] *at the time of entry.*
>
> HQ 557707 (May 4, 1994) (emphasis added).

*Id* at 1098.

In *Leather's Best, Inc. v. United States*, 10 CIT 321, 323 (Ct. Int'l Trade 1986), the Court likewise recognized that documentation supporting a claim for preferential duty treatment could be submitted after entry and potentially as late as trial, provided liquidation had not become final and the importer could establish that the failure to file earlier was not attributable to willful negligence or fraudulent intent. Accordingly, the failure to provide supporting documentation at entry did not, by itself, warrant dismissal of the importer's claim.

Under 19 C.F.R. § 10.112, documents required to support free or reduced-duty treatment may be submitted after entry, provided the failure to file them earlier was not due to willful

negligence or fraudulent intent. Such documents may be filed at any time before liquidation or, if liquidation has occurred, before the liquidation becomes final. As the Court recognized in *Gulfstream Aero. Corp. v. United States*, 21 C.I.T. 1083, 1099 (Ct. Int'l Trade 1997), a timely filed protest prevents a Customs liquidation from becoming final and conclusive under 19 U.S.C. § 1514(a)[13].Where the denial of a protest is timely challenged in the Court of International Trade, the contested Customs decision likewise does not acquire the finality prescribed by § 1514(a) while judicial review remains pending.

The circumstances surrounding Netgear's submission of the declarations supports the timeliness of those documents under 19 C.F.R. § 10.112.

On September 29, 2021, Netgear filed a protest contesting Customs' assessment of Section 301 duties and claiming treatment under subheading 9802.00.50, HTSUS. PSUMF ¶ 5. In that protest, Netgear expressly advised Customs that it intended to supplement the protest within two weeks with an amended commercial invoice and payment documentation, the declarations required under 19 C.F.R. § 10.8, and the original import documentation for the 4,370 LTE routers. See Pl. Exhibit No. 16.

On October 1, 2021, just two days after the protest was filed, Wistron NeWeb Service (Kunshan) Corp. executed the foreign repairer's declaration identifying the merchandise and certifying the repairs or alterations performed and their value. PSUMF ¶¶ 15-16. Before the supplement was completed and submitted, Customs denied the protest on October 25, 2021. ECF 1, Summons; PSUMF ¶ 6. These circumstances demonstrate that Netgear was actively pursuing

---

[13] Decisions of the Customs Service. . . as to-- (2) the classification and rate and amount of duties chargeable . . . shall be final and conclusive . . . unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest . . . is commenced in the United States Court of International Trade." 19 U.S.C. § 1514(a) [emphasis added]

the documentation necessary to substantiate its claim and support the conclusion that not submitting the declarations earlier was not attributable to willful negligence or fraudulent intent.

Netgear obtained the owner/importer/consignee declaration executed by Kelly Nakamura on June 6, 2022, confirming that the articles had been exported for repairs or alterations without the benefit of drawback and that the returned merchandise consisted of the same articles previously exported. PSUMF ¶ 19. The declarations are further supported by the original entry documentation, export records, commercial invoices, packing lists, RMA documentation, and serial-number records. PSUMF ¶¶ 20-22, 25, 38, 62.

As in *Mattel*, Netgear took affirmative steps demonstrating its intention to pursue the claimed duty treatment and provide the required supporting documentation. Netgear expressly identified the missing documents in its timely protest, advised Customs that it intended to supplement its claim, obtained Wistron's declaration shortly thereafter, and continued working to complete the supporting documentation before Customs denied the protest. These actions support the finding that the submission the declarations after entry was not attributable to willful negligence or fraudulent intent. See *Mattel, Inc. v. United States*, 624 F.2d 1076, 1079-80 (C.C.P.A. 1980); *Gulfstream Aerospace Corp. v. United States*, 21 CIT 1083, 1096-1101 (Ct. Int'l Trade 1997).

Accordingly providing the declarations after entry does not, standing alone, bar consideration of the documents supporting its claim under subheading 9802.00.50, HTSUS. Section 10.112 provides a mechanism for accepting such documentation after entry and prior to the finality of liquidation, subject to its requirements, and the declarations and supporting records should be considered in determining whether the subject LTE routers qualify for treatment under subheading 9802.00.50, HTSUS.

### B. Section 301 Duties Should Be Assessed on the Qualifying Foreign Repair or Alteration Value

Defendant admits that, for merchandise properly eligible for treatment under subheading 9802.00.50, HTSUS, Section 301 duties under subheading 9903.88.04 are assessed on the value of the repairs or alterations performed outside the United States, as prescribed by the tariff provision and applicable regulations. [see ECF 10, Answer ¶ 32]. Accordingly, because the LTE routers qualify for treatment under subheading 9802.00.50, the additional Section 301 duties must be assessed on the qualifying foreign repair or alteration value rather than the entered value of the routers.

Specifically, Wistron's rework cost breakdown identifies a charge of [redacted] per router for 4,370 units, totaling [[redacted]]. This amount includes sorting, rework, testing, equipment rental, and materials associated with the modifications. During rework, two LCD modules were replaced at an additional cost of [[redacted]]. Accordingly, the total cost of the qualifying foreign repairs or alterations was [[redacted]]. PSUMF ¶¶ 16, 30-31, Plaintiff's Exhibit No. 5.1.

Separately, Wistron replaced 656 lithium-ion battery packs because of corrosion or deterioration, at a cost of [[redacted]] per battery, totaling [[redacted]]. PSUMF ¶¶ 17-18, 33-34. The batteries were not installed in the LTE routers but were packaged separately with the units, and Netgear has not included their replacement cost in its claim under subheading 9802.00.50. PSUMF ¶¶ 35-36. Thus, the [[redacted]] attributable to the replacement batteries is separate from the [[redacted]] claimed as the qualifying foreign repair or alteration value.

The combined cost of the router rework, replacement LCD modules, and replacement batteries was [redacted], as reflected in Wistron's detailed rework cost breakdown. PSUMF ¶¶ 16–18, 30-31, 33-37. Wistron Invoice No. 20530381 reflects a charge of [[redacted]], which Netgear's payment records confirm was paid as part of a larger payment on June 25, 2020. The

payment summary also identifies a separate [[redacted]] payment associated with the same purchase order, accounting for the difference between the invoiced amount and the total stated rework cost. PSUMF ¶ 37; Plaintiff's Exhibit Nos. 5.1, 6.1, and 6.3. In any event, the qualifying foreign alteration value of [[redacted]] is separately supported by Wistron's itemized rework costs and repair declaration. PSUMF ¶¶ 5, 10-11, 16, 31, 36.

Accordingly, because the LTE routers qualify for treatment under subheading 9802.00.50, HTSUS, the declared value of the routers should not be used as the basis for assessing the Section 301 duties. Netgear requests that the Court direct CBP to reliquidate Entry No. 113-8841055-4, assessing Section 301 duties on the qualifying foreign repair or alteration value of [[redacted]], with the replacement batteries treated separately in accordance with their applicable tariff treatment, and refund the excess duties paid, together with applicable interest.

## VII. CONCLUSION

For the reasons set forth above, plaintiff respectfully requests that this Court grant plaintiff's motion for summary judgment in full and sign plaintiff's proposed judgment order.

Respectfully Submitted,
/s/George R. Tuttle, III

George R. Tuttle, III
Law Offices of George R. Tuttle, A.P.C.
3950 Civic Center Drive, Suite 102
San Rafael, CA 94903
Tel. (415) 986-8780
Email: geo@tuttlelaw.com

Attorney for Plaintiff Netgear Inc.

Dated: October 26, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Memorandum of Law in Support of Plaintiff's Rule 56 Motion for Summary Judgment, as computed by Law Office of George R. Tuttle word processing system Microsoft Word 365 ProPlus, is 9,474 words, less than the 14,000 word limit.

*/s/ George R. Tuttle, III.*
George R. Tuttle, III
*Counsel for Plaintiff*